UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ANDRES FALCON and DONNA FALCON, | § § § | No. 1:12-CV-491-DAE |
| Plaintiffs, | § § | |
| vs. | § § | |
| STATE FARM LLOYDS, | § § | |
| Defendant. | § | |

ORDER:  (1) GRANTING DEFENDANT'S MOTION TO STRIKE EXPERT
TESTIMONY OF JAMES FIELDS; (2) GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO STRIKE EXPERT TESTIMONY OF
MARION ARMSTRONG; (3) GRANTING DEFENDANT'S MOTION TO
STRIKE EXPERT TESTIMONY OF STEPHEN HADHAZI; AND
(4) DENYING PLAINTIFFS' MOTION TO STRIKE EXPERT TESTIMONY OF
STEPHEN WAIDE

On May 5 and 6, 2014, the Court heard Defendant's and Plaintiffs'

motions to strike and conducted evidentiary hearings pursuant to Daubert v.

Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) (the "Daubert hearings").  Robert

L. Collins, Esq., Audrey E. Guthrie, Esq., and Richard A. Grigg, Esq., appeared on

behalf of Plaintiffs, and Richard W. South, Esq., and Christopher Shuley, Esq.,

represented Defendant.

After reviewing the motions and the supporting and opposing

memoranda, and considering the testimony proffered at the Daubert hearing, the

1

Court (1) **GRANTS** Defendant's Motion to Strike Expert Testimony of James Fields (Dkt. # 27); (2) **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Strike Expert Testimony of Marion Armstrong (Dkt. # 29); (3) **GRANTS** Defendant's Motion to Strike Expert Testimony of Stephen Hadhazi (Dkt. # 28); and (4) **DENIES** Plaintiffs' Motion to Strike Expert Testimony of Stephen Waide (Dkt. # 43).

<u>BACKGROUND</u>

Plaintiffs Andrew and Donna Falcon (the "Falcons") purchased a homeowners insurance policy (Policy No. 83-LV-9557-4) (the "Policy") through Defendant State Farm Lloyds ("State Farm") covering their property at 131 Rainbow drive, Bastrop, Texas (the "Property" or the "Falcon residence").  (Dkt. # 1-2 ¶ 7.)  The Falcons timely made all required premium payments under the policy.  (<u>Id.</u>)

In September 2011, a wildfire occurred in Bastrop County (the "Bastrop fire" or the "Bastrop wildfire").  (<u>Id.</u>)  On September 6, 2011, the Falcons contacted State Farm stating that they believed their house had been destroyed by the Bastrop fire.  (Dkt. # 46 ¶ 2.)  State Farm issued the Falcons a $5,000 advance to assist them while they were barred from their home by the authorities.  (<u>Id.</u>)  Although the fire did not cause significant physical damage to the Property, the

Falcons filed a claim with State Farm seeking to recover under their policy for damage caused by exposure to the fire's smoke.  (Id.)

On September 9, 2011, State Farm assigned Vidale Coleman, a catastrophe claims adjuster, to evaluate the Falcons' claim.  (Id. ¶ 3.)  On September 12, 2011, Coleman drove to the Property and found it was still standing. (Id. ¶ 4.)  Coleman and the Falcons agreed that Coleman would inspect the Property on September 16, 2011.  (Id. ¶ 5.)

On September 16, 2011, Coleman inspected the Property with Donna Falcon.  (Id. ¶ 6.)  According to State Farm, Coleman "did not find any direct fire damage to the roof or the exterior of the house."  (Id.)  However, Coleman did find "minor fire damage" on the deck and damage to the trees and lights in the yard. (Id.)  Coleman also allowed for "cleaning of the interior and exterior of the residence due to soot, and food loss at the residence."  (Id.)  State Farm claims that Donna Falcon asked about smoke damage to the carpet and that Coleman informed her "she would first need to attempt to clean the carpet before State Farm would authorize replacement."  (Id.)  Similarly, Donna Falcon asked whether State Farm would replace one of the refrigerators due to the smell caused by rotting food remaining in there after the power went out.  (Id. ¶ 8.)

State Farm states that the Falcons contacted Service Master who estimated the cost to clean the residence was $8,103.75.  (Id. ¶ 7.)  State Farm received this estimate around September 23, 2011.  (Id.)

On September 26, 2011, Coleman prepared an estimate allowing for (1) the policy limit of $8,245.00 for the trees, shrubs, and other plants in the yard; and (2) $8,398.12 for remediation of the house, including the cleaning by Service Master and repairs to the deck.  (Id. ¶ 8.)  State Farm denied coverage for the refrigerator because the damage was not caused by a "covered peril."  (Id.)  It then issued a check to the Falcons for $11,643.12 for the total, less the $5,000 advance State Farm had already provided to the Falcons.  (Id.)  Additionally, State Farm issued a check for $1,505.94, covering the Falcons' alternative living expenses ($1,045.94), food loss ($250.00), and damage to personal property ($210.00).  (Id.) Coleman discussed these payments with the Falcons, and the check was sent around September 26, 2011.  (Id.)

On October 7, 2011, Coleman issued a new statement of loss that included an additional $991.90 in forced evacuation expenses and $114.78 to clean the Falcons' personal property.  (Id. ¶ 10.)  State Farm issued a check; however, the Falcons did not receive it, so State Farm stopped payment and reissued the

check.  (Id.)  In addition, State Farm paid another $2,037.84 in living expenses and forced evacuation expenses.[1]  (Id. ¶ 11.)

According to State Farm, Donna Falcon contacted State Farm regarding the invoice she received from Service Master.  (Id. ¶ 12.)  Donna Flacon claimed she did not have the money to pay the invoice and that she believed State Farm would be responsible for it.  (Id.)  State Farm told her that it had issued payment to the Falcons covering this expense, and it was their responsibility to pay the contractors.  (Id.)

Subsequently, State Farm received a letter from the Falcons' attorney seeking full payment of the claim and attaching an estimate from Stephen Hadhazi, a public adjuster, claiming the Falcons were entitled to payment in the amount of $112,766.59 to remediate the Property entirely.  (Id. ¶ 13.)

In response, State Farm engaged Glen Hart, a claims adjuster, to re-inspect the Property and review the claim.  (Id. ¶ 14.)  On March 2, 2011, Hart reviewed the claim and contacted the Falcons' attorney; Hart then sent the Falcons' attorney a letter on March 15, 2012, seeking to set up a specific time to re-inspect the Property.  (Id. ¶ 15.)  Hart received no reply until April 23, 2012, when the Falcons' attorney told Hart he could re-inspect the Property on April 30, 2012. (Id. ¶ 18.)

---

[1] According to State Farm, there is no dispute over this amount.  (Dkt. # 46 ¶ 11.)

Meanwhile, on April 5, 2012, State Farm received an invoice from National Smoke Contaminant Testing, a business owned by James Fields, in the amount of $2,900 and a lab report from Armstrong Forensic Laboratory, Inc., ("Armstrong Labs") dated January 17, 2012.  (Id. ¶ 16.)  State Farm sent this report to Ninyo & Moore, an environmental sciences consulting company, for review on April 11, 2012.  (Id.)  State Farm refused to pay the invoice because it had not ordered or authorized the test.  (Id.)

On April 30, 2012, Hart inspected the Property with Donna Falcon and a representative from Service Master.  (Id. ¶ 18.)  According to State Farm, "Hart noted that the Falcons had removed all of the carpet in the house and installed hard wood floors."  (Id.)  Additionally, Hart reported that he "did not find any soot in the interior of the residence, and the representative from Service Master who attended the re-inspection indicated the house had been properly cleaned." (Id.)

On May 3, 2012, Ninyo & Moore reported to State Farm that "the Armstrong lab report was incomplete and was not sufficient to provide any meaningful information about the condition of the Falcons' house."  (Id. ¶ 19.)

On May 7, 2012, the Falcons filed suit against State Farm and Rivers Alexander Schara, an agent of State Farm.  (Dkt. # 1-2.)  The Falcons contend that State Farm and Schara failed to properly investigate their insurance claim as

6

required by the policy.  (Id.)  The Falcons alleged that (1) State Farm breached its

contractual obligations, (2) State Farm and Schara breached the duty of good faith

and fair dealing, (3) State Farm and Schara violated Chapter 541 of the Texas

Insurance Code, (4) State Farm and Schara violated the Texas Deceptive Trade

Practices Act, (5) State Farm violated § 542 of the Texas Insurance Code, and

(6) State Farm and Schara caused the Falcons mental anguish.  (Id. ¶¶ 10–18.)  The

Falcons seek multiple damages, punitive damages, attorney's fees, and special

damages from State Farm and Schara.  (Id. ¶¶ 19–24.)

      On June 6, 2012, State Farm and Schara removed the case to this

Court.  (Dkt. # 1.)  Subsequently, State Farm and Schara moved to dismiss Schara

from the suit because Schara had been improperly joined.  (Dkt. # 7.)  The Court

granted the motion, and Schara was dismissed on August 6, 2012.  (Dkt. # 9.)

      On October 7, 2013, State Farm moved to strike the expert testimony

of James Fields.  (Dkt. # 27.)  State Farm then moved to strike the expert testimony

of Stephen Hadhazi on October 9, 2013, and it moved to strike the expert

testimony of Marion Armstrong on October 11, 2013. (Dkt. ## 28, 29.)

      On November 21, 2013, the Falcons moved to strike the expert

testimony of Stephen Waide.  (Dkt. # 43.)

      The majority of the expert testimony that the parties challenge is

based upon various air quality and particulate matter samples taken at the Falcon

residence.  First, Fields took between twenty and twenty-five samples of particulate matter from the Falcon residence in the Fall of 2011.  (Dkt. # 30-3 at 38.)  Of these, Fields sent two alcohol swabs to Armstrong Labs.  (Dkt. # 29-5 at 2.)  Armstrong Labs generated a report analyzing these swabs dated December 29, 2011.  (Id.)

Armstrong Labs received another sample from Fields on January 11, 2012.  (Dkt. # 29-6 at 2.)  This time, Fields sent a sterile cotton swab.  (Id.)  Armstrong Labs generated a report analyzing the swab dated January 17, 2012.  (Id.) A second identical report containing a different address for Fields was issued on January 28, 2012.  (Id. at 4.)

Additionally, on October 4, 2012, Exponent Laboratories conducted an assessment of the Falcon residence and property.  (Dkt. # 29-2 at 10.)  During this assessment, Exponent collected nine surface samples of which they tested six samples and one blank sample.  (Id.)  Exponent also collected nine surface vacuum samples of which they tested six samples and one blank sample.  (Id.)

During the summer of 2013, Fields returned to the Falcon residence and took an air quality sample using a device known as a Sep-Pak; this sample was then sent to Armstrong Labs for analysis.  (Dkt. # 29-7 at 2.)  Armstrong produced a report on this sample dated July 9, 2013.  (Id.)

8

LEGAL STANDARD

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    a. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
    b. the testimony is based on sufficient facts or data;
    c. the testimony is the product of reliable principles and methods;
    d. the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  This rule lays responsibility on the court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589.

      "In rulings on the admissibility of expert opinion evidence the trial court has broad discretion . . . ." Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 881 (5th Cir. 2013) (internal citations and quotation marks omitted).  The Fifth Circuit maintains that district courts are to "function as gatekeepers and permit only reliable and relevant expert testimony to be presented to the jury." Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999).  It is the role of the district court to assure "that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" Id. (quoting Fed. R. Evid. 702).  A court "should refuse to allow an expert witness to testify if the witness is

9

not qualified to testify in a particular field or on a given subject." Id.  However, if

an expert's testimony constitutes shaky, but admissible evidence, the court should

rely on "vigorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof" to mitigate the shakiness of the testimony.  Id.

(quoting Pipitone v. Biomatrix, Inc., 288 F.3d 239, 250 (5th Cir. 2002)).  "Courts

act as gatekeepers of expert testimony 'to make certain that an expert, whether

basing testimony upon professional studies or personal experience, employs in the

courtroom the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field.'"  Recursion Software, Inc. v. Double-Take Software,

Inc., No. 4:10-CV-403, 2012 WL 1576252,*2 (E.D. Tex. May 4, 2012) (quoting

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)).

> To be reliable and therefore admissible under Rule 702 of the Federal
> Rules of Evidence, expert testimony as to a scientific, technical, or
> other specialized area must: (1) assist the trier of fact to understand
> the evidence or to determine a fact in issue; (2) be based upon
> sufficient facts or data; (3) be the product of reliable principles and
> methods; (4) and have reliably apply the principles and methods to the
> facts.

Padre Enterprises, Inc. v. Rhea, No. 4:11CV674, 2013 WL 4284925, at *1 (E.D.

Tex. Aug. 13, 2013).  In determining whether testimony is reliable, the court relies

on numerous factors including, "(1) whether the expert's theory or technique can

be or has been tested; (2) whether the theory or technique has been subjected to

peer review and publication; (3) the known or potential rate of error of the

10

challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community." Daubert, 509 U.S. at 593–94. In evaluating these factors, the court must focus on the expert's "principles and methodology, not on the conclusions" generated. Id. at 594. "[I]n a jury trial setting, the Court's role under Daubert is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration." Retractable Tech., Inc. v. Becton, Dickinson and Co., No. 2:08-CV-16-LED-RSP, 2013 WL 4574258, at *1 (E.D. Tex. Aug. 27, 2013).

"In addition to being reliable, expert testimony must 'help the trier of fact to understand the evidence or to determine a fact in issue.'" Roman v. Western Mfg., Inc., 691 F.3d 686, 694 (5th Cir. 2012) (citing Fed. R. Evid. 702(a)). Under Rule 702, this means that the proffered expert testimony must be relevant. Id. "Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful." Id. (quoting Daubert, 509 U.S. at 591 (internal quotation marks and citations omitted)). "Expert testimony is admissible only if the proponent demonstrates that: (1) the expert is qualified; (2) the evidence is relevant to the case; and (3) the evidence is reliable." Watkins v. Telsmith, Inc., 121 F.3d 984, 988–89 (5th Cir. 1997).

"The burden to demonstrate that the expert's findings and conclusions are based on valid scientific method, and are therefore reliable, is placed on the party seeking its admission."  <u>Castellow v. Chevron USA</u>, 97 F. Supp. 2d 780, 783 (S.D. Tex. 2000).

DISCUSSION

I.      <u>Plaintiffs' Expert:  James Fields</u>

State Farm objects to Fields' testimony arguing that he is not qualified to render an expert opinion on the following topics:  (1) that the samples he took from the Falcon residence in the fall of 2011 and August 2013 were in accordance with any accepted methodology or standard; (2) that the fall 2011 and August 2013 samples were representative or indicative of damage to the Falcon home; (3) that the fall 2011 and August 2013 samples were handled in accordance with any accepted methodology or standard; (4) the nature or extent of damage to the Falcon residence; (5) whether a homeowner is obligated to disclose smoke damage on a Texas Seller's disclosure form or under the Texas Deceptive Trade Practices Act; and (6) whether smoke damage has reduced the value of the Falcon residence. (Dkt. # 27 at 3.)

As a preliminary matter, the Falcons argue that to the extent Fields is presenting testimony regarding facts, rather than opinions, it is not subject to a

12

Daubert challenge.  The Court agrees, and to the extent that Fields testifies to his

personal observations, that testimony is not subject to a Daubert challenge.

    A.    Fields' Qualifications as an Expert in Smoke Contaminant Testing

        According to Fields' curriculum vitae, his education consisted of a

high school degree completed in 1971 and five years of night school in the

business school at the University of Houston.[2]  (Dkt. # 27-1.)  Subsequently, Fields

worked in a variety of jobs including bank teller, bank purchasing agent, grocery

store assistant manager, and sales manager.  (Id.)  In 1995, Fields transitioned into

real estate.  (Id.)  Between 1995 and 2000, Fields built and sold office warehouse

projects.  (Id.)  Then in 2000, he became the Director of Real Estate for an

unnamed "large developer" in Southern Texas.  (Id.)  Fields retained this position

until 2008.  (Id.)  Between 2009 and 2010, Fields lists his occupation as semi-

retired real estate broker and developer.  (Id.)  In 2011, Fields formed and became

president of National Smoke Contaminant Testing.  (Id.)

        Fields claims he became an expert in how and where smoke damage

occurs "through extensive training with Mr. Dale Everett."  (Id.)  Fields states that

Everett is his business partner and the retired Assistant Fire Chief of the Houston

Fire Department with twenty-three years of experience.  (Id.)  Fields asserts that

"Mr. Everett spent countless hours going over Fire Department tapes - movies and

---

[2] Fields did not graduate from the University of Houston.  (Dkt. # 27-1.)

reference materials n [sic] an education process that has been invaluable.  Mr.

Everett is the CEO of our company."  (Id.)

State Farm challenges Fields' qualification as an expert capable of

testifying about the smoke contamination testing he conducted and the alleged

smoke damage to the Falcon residence.  (Dkt. # 27 at 4.)  State Farm asserts that

Fields' education and work history have not provided him with scientific, technical

or other specialized knowledge that qualifies him as an expert.  (Id.)  State Farm

argues that Fields' only qualifications derive from discussions with Everett, a

single discussion with Marion Armstrong, a certified industrial hygienist with

Armstrong Labs, and self-study of unidentified materials.  (Id. at 5.)  State Farm

contends that Fields is not qualified to testify that he took the samples from the

Falcon residence in accordance with any accepted methodology or standard.  (Id. at

4–5.)

In response, the Falcons argue that Fields has a "comprehensive

knowledge of the appropriate processes and methods of smoke damage test sample

collection."  (Dkt. # 30 at 4–5.)  The Falcons contend that Fields' interactions with

Everett qualify him as an expert.  (Id.)  The Falcons assert that Everett has more

than twenty years of experience training firefighters and professionals regarding

smoke and smoke damage.  (Id.)  Additionally, the Falcons maintain that Everett

observed Fields take samples on multiple occasions.  (Id.)  The Falcons assert that

14

Fields has conducted between 225 and 250 "smoke damage tests and interviewed occupants in over 150 homes and other structures in connection with the Bastrop-area wildfire events that damaged the Falcon home by heat and smoke." (Id.)  The Falcons contend that Fields has conducted similar testing in Arizona, Colorado, Indiana, and Washington.  The Falcons claim that through these experiences, Fields has learned from the homeowners of the damage that smoke can cause to structures and personal property.  (Id.)

The Court must thoroughly examine Fields' qualifications.  First, from Fields' curriculum vitae, it is apparent that Fields does not possess any formal education regarding the effects of smoke on a residential structure or regarding proper procedures for determining whether a structure has been damaged by smoke.  (Dkt. # 30-5 at 2.)  Fields has not completed any educational degree beyond high school; he does possess some post-secondary education, but this concentrated in business administration and does not appear to have any applicability to smoke damage or testing.  (Id.; Dkt. # 30-3 at 41:23–42:1.)

The Court recognizes that formal education is not the only means to obtain expertise in a relevant area; and therefore, the Court must evaluate whether Fields' self-study and experience is enough to qualify him as an expert.  In Fields' case, he relies on discussions he had with Everett, as well as self-study of literature

provided to him by Everett, and a conversation with Marion Armstrong as the basis for his expertise.[3] (Dkt. # 30-6 at 1.)

      1.     Fields' Consultation with Everett

      Fields bases much of his expertise on his partnership with Everett. According to Fields, prior to conducting smoke contaminant testing, Fields read "some information and some articles . . . about fire science and smoke" that Everett provided to him.  (Dkt. # 30-3 at 72:19–25.)  Fields did not keep possession of these articles, but rather returned them to Everett.  (Id. at 73:1–2.)  Fields also stated he educated himself through the internet; however, when asked during his deposition about what he had read, he could not recall any specifics:

---

[3] In his deposition, Fields also mentions that he spoke with a doctor at ACT Labs, whose name he could not remember.

> Q.    The only thing you remember about that conversation was his suggestion that you use a poly puff filter, correct?
> A.    Poly foam filter, yes.

(Dkt. # 30-3 at 103:20–23.)

Fields also stated that he spoke to a Dr. Wooters at Armstrong Labs.

> Q.    You also talked to Dr. Wooters at Armstrong Labs.  And the only thing that you recall that he told you to use use was to use a chain of custody form, to make sure your samples weren't tampered with and to send the sample FedEx, correct.
> A.    Correct.

(Dkt. # 30-3 at 104:6–11.)

Q.    Okay. You also told me that you looked at the internet and
       some books for some technical information about becoming a
       smoke contaminant testing technician, correct?

A.    Correct.

Q.    Again, as of last September you had no idea what those books
       were nor could you recall what you had looked at on the
       internet.  Is that true still today?

A.    I cannot quote you a specific article or a specific author or a
       specific website that I went to to review information.

. . .

Q.    Well, is it true, sir, that you looked on the internet to try to
       figure out how to do your sampling?

A.    As part of my process, yes, I did review sites on the internet.

Q.    But you can [sic] tell me what you read or what it might have
       said, correct?

A.    No, I sure can't.

(Id. at 74:2–12, 103:8–14.)

Similarly, Fields had only a limited recollection of what his

discussions with Everett entailed.  (Id. at 73:16–74:1.)  He did recall that Everett

advised him to identify from where a sample was taken and observed Fields take

samples approximately twelve times; however, that appears to be the extent of his

recall of their conversations.  (See id. at 50:16–25; 104:19–22.)

It is unclear what value Everett could add to Fields' expertise in

smoke contaminant sampling.  There is no evidence that Everett has any

experience or training in conducting smoke contaminant sampling, and Fields

stated that Everett has never conducted smoke testing on behalf of National Smoke

Contaminant Testing.  (Id. at 50:16–19.)

17

2.    <u>Conversation with Armstrong</u>

In early 2013, Fields met with Armstrong to discuss the samples he had been sending and the process for taking air quality samples.  (<u>Id.</u> at 26:10–15.)  The meeting lasted between one and two-and-a-half hours, and they discussed general testing issues as well as the sample media Fields was using.  (<u>Id.</u> at 27:13–24.)  According to Fields, "[w]e discussed air quality testing that can be done in the houses and the effect that they show as far as offgassing and different contaminants that are involved from that."  (<u>Id.</u> at 28:7–10.)  However, Armstrong did not provide him with any materials to study; instead, they "talked in general terms about how it is done and why it's done that way."  (<u>Id.</u> at 28:16–17.)  Armstrong did not provide Fields with any industry-wide standards for smoke sampling, and Fields did not ask if any existed.  (<u>Id.</u> at 29:15–20.)  Fields also spoke with a chemist at Armstrong Labs, Dr. Wooters, who Fields stated did not have any issues with the samples he was sending to Armstrong Labs.  (<u>Id.</u> at 30:6–13.)  However, Fields was not able to recall any specifics of these conversations.  There is no indication to the Court that these conversations constituted a thorough evaluation of the techniques Fields was using.

During this meeting, Fields and Armstrong also discussed the use of a Sep-Pak filter to sample air quality.  (<u>Id.</u> at 31:19.)  Again, Fields could not recall specifics of the conversation, and there is no indication that it was anything more

18

than a vague discussion of Sep-Pak samples.  The Court notes that Fields had never

before used a Sep-Pak to sample air quality; however, between the meeting with

Armstrong in early 2013 and when he took a Sep-Pak sample at the Falcon

residence in July 2013, Fields took between twenty and twenty-five Sep-Pak

samples.  (Id. at 31:17–24.)  The Court finds that there is no evidence that this

conversation qualified Fields as an expert on this topic.

        In his deposition, Fields clarified that the meeting with Armstrong

was not a training session, but just Fields checking that everything was fine.  (Id. at

66:1–8.)  Fields stated that Armstrong "reviewed what I was doing and how I was

doing it and she was very comfortable with what I was doing and how I was

providing sampling and she encouraged me to keep doing so, you know."  (Id. at

66:5–8.)  In his affidavit, Fields claims that his sampling procedures were

"developed by myself, my partner Dale Everitt [sic] (a Retired Deputy Chief of the

City of Houston Fire Department for 23 years who trained firefighters at A&M

Fire School for 30 years), and Marion Armstrong."  ("Fields' Aff.," Dkt. # 30-6 at

1.)  However, the Court notes that Fields did not meet with Armstrong until early

2013, long after he took the first samples from the Falcon residence in the fall of

2011.  (Id.)

        Upon consideration of the evidence, the Court finds that Fields' self-

study and experience do not qualify him as an expert in smoke contaminant

sampling and testing procedures.  First, Fields had no experience with smoke

contaminant testing prior to the Bastrop fires.  (Dkt. # 30-3 at 67:19–22.)  Second,

Fields' "course of study" that he claims qualifies him as an expert in smoke

contaminant testing is woefully inadequate.  Fields cannot point to any literature

from which he derived his knowledge, and he can provide little detail about the

knowledge he obtained from Everett or Armstrong.  Additionally, Fields did not

make any effort to inform himself of any industry standards or practices for

sampling.

> Q.   Would it interest you in your business to know that there's a
>      standard practice for sampling and testing of possible carbon
>      black fugitive emissions?
> A.   Is that a question?
>  …
>
> Q.   Would it be of interest to you in your business to know that
>      there is an ASTM method for testing in the profession that
>      you're in?
> A.   I would be interested, but it doesn't necessarily mean it's a
>      requirement.
> Q.   Well, I understand, sir.  You certainly haven't sought it out
>      though?
> A.   No, I haven't.

(Id. at 105:7–10, 105:13–21.)

Fields' course of self-study appears to have left significant gaps in his

knowledge.  Fields was even unfamiliar with the concept of taking a blank sample

as a control to ensure that there was no extraneous source of contamination.  (Dkt.

# 30-3 at 142:23–143:4.)  When asked how Fields educated himself on how to use a Sep-Pak, he stated "Dr. Spurgeon[4] showed me how to do air quality tests.  I went through the protocol with Marion Armstrong and she said to do it the exact same way and use a Sep-Pak . . . ."  (Id. at 134:21–24.)  However, Dr. Spurgeon did not use Sep-Paks to conduct air quality tests, so it is unclear how Fields' conversation with him prepared Fields to use a Sep-Pak.  (Id. at 135:4–5.)  And Fields readily admitted that he did nothing else to educate himself about the proper use of a Sep-Pak other than read the instructions.  (Id. at 135:11–136:2.)  Additionally, during his deposition, Fields could not state at what temperature the Sep-Pak samples need to be kept to remain viable other than that they needed to be chilled.  (Id. at 136:21–137:5.)

Although Fields claims to have extensive experience testing for smoke contaminants, asserting that he has taken between 225 and 250 samples  as of September 2013 (id. at 75:7–10), the Court finds that taking a large number of samples without the necessary knowledge or reliable procedures does not qualify an individual as an expert.  Similarly, although Fields relies heavily on Everett's qualifications as the basis for his own expertise, there is no evidence in the record regarding Everett's qualifications in the area of smoke contaminant testing.

---

[4] Dr. Spurgeon is apparently an industrial hygienist in California.  (Dkt. #30-3 at 132:2–10.)  From the record it appears that Fields has interacted with him, but there is no indication of the depth of their relationship.  (Id.)

Additionally, as discussed infra, Fields' lack of knowledge of proper sampling procedure demonstrates that he is not qualified as an expert in smoke contaminant sampling.  First, when asked about standard sampling procedures, Fields was unaware as to whether there were standard sampling procedures, and stated that even if he had known of them, he would not have felt required to employ them.  (Dkt. # 30-3 at 105:4–21.)

Second, as discussed above, Fields failed to take a field blank sample. At the Daubert hearing, certified industrial hygienist Michael Cleveland testified that, as an industrial hygienist, he could not reach a valid opinion based upon a sample of either air or particulates taken without a field blank.  ("Tr.1," Dkt. # 62 at 60:3–7.)

Third, Fields was unaware of the intricacies of calibrating the Sep-Pak he used to take air quality samples at the Falcon residence.  (See Dkt. # 30-3 at 138:20–140:1.)  He stated he simply attached a calibration mechanism to the Sep-Pak and then left the device on for an hour to collect a sample.  (Id. at 139:2–140:1.)  Fields could not state how many liters of air were collected during that hour or how long he took to calibrate the Sep-Pak.  (Id.)  Only later did Fields recall that he had used an SKC-Rotameter to calibrate the Sep-Pak. (Dkt. # 30-6 at 2.)  However, at the Daubert hearing, Cleveland testified that calibrating a Sep-Pak is an intricate process; the Sep-Pak must be calibrated to either a primary standard

22

or to a secondary standard that was, itself, calibrated to a primary standard. Cleveland testified that calibration is necessary because sampling devices, like Sep-Paks, are not accurate out of the box, and an inaccurately calibrated Sep-Pak can create bias in the samples.  (Tr.1 at 64:1–9.)  Cleveland testified that an SKC-Rotameter is a secondary standard and any results from it would be unreliable if it had not been previously calibrated to a primary standard.  (Id. at 64:10–16.) Fields' deposition makes no mention of these necessary procedures, and in fact, his testimony does not show he had any substantive knowledge of required calibration procedures.  (See Tr.1 at 20–23.)

"Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"  United States v. Cooks, 589 F.3d 173, 179 (5th Cir. 2009).  The burden of demonstrating an expert's qualifications rests with the party proffering the expert's testimony.  Orthoflex, Inc. v. ThermoTek, Inc., Nos. 3:11-CV-0870-D, 3:10-CV-2618-D, 2013 WL 6476371, at *1 (N.D. Tex. Nov. 20, 2013).

For the reasons discussed above, the Court finds that Plaintiffs have not met their burden.  Fields is not qualified as an expert to testify regarding smoke contaminant testing procedures or smoke damage.  It is clear to the Court that Fields has only a basic knowledge of these disciplines, not an expertise in the field.

23

For these reasons, the Court will not permit Fields to testify regarding (1) whether the samples he took from the Falcon residence were taken and handled in accordance with any accepted methodology or standard; (2) whether the samples he took were indicative of smoke damage to the Falcon residence; and (3) the nature and extent of damage to the Falcon residence.  However, this does not preclude Mr. Fields from providing factual testimony regarding what he did or observed.

     B.    <u>Fields' Qualifications Regarding the Value of Real Estate Impacted by Smoke Damage and Disclosure Obligations</u>

Fields also has held himself out as expert on the effect of smoke contamination on real estate obligations and property values.  (Dkt. # 30-1 at 1, 3.) As discussed above, Fields does not possess any formal education related to real estate disclosure obligations or the Texas Deceptive Trade Practices Act.  (<u>See</u> Dkt. # 30-5 at 2–3.)  However, Fields has been involved in the real estate business since 1995.  (<u>Id.</u>)  Between 1995 and 2000 Fields worked as a self-employed real estate broker/developer, and then between 2000 and 2008, Fields worked as the Director of Real Estate for a large developer in Texas and New Mexico.  (<u>Id.</u>) Fields' curriculum vitae does not name the developer, but it does state that Fields was responsible for all land acquisition, retail leasing, condominium sales, and property sales.  (<u>Id.</u>)

In his expert report, Fields states that "the Falcons will be required to disclose the smoke and fire damage to their property should they ever seek to sell it." (Id. at 1.)  He avers that this disclosure is required under the Texas Real Estate Commission's Seller's Disclosure Statement because it requires sellers to disclose known defects.  (Dkt. # 30-1 at 3–4.)  Fields states that the Falcons also will be obligated to disclose smoke damage under the Texas Deceptive Trade Practices Act.  (Id. at 4.)  Fields opines:

> the seller of real property in Texas is not permitted to conceal material facts that affect the value of the property.  Knowledge that the air within a dwelling causes health complaints or electronics failures is knowledge of a condition that materially affects the use and value of the home.  To conceal it from a prospective buyer, while selling the property as a home is likely a violation of Texas' Deceptive Trade Practices Act.

(Id.)  Next, Fields contends that disclosure is required because occupants of homes exposed to wildfire smoke often have health problems including respiratory issues and headaches.  (Id. at 3.)  Finally, Fields asserts that "[b]uyers will view un-remediated homes as damaged."  (Id. at 4.)

      1.    <u>Opinions regarding the Seller's Disclosure Statement and Texas Deceptive Trade Practices Act</u>

First, Fields bases his determination that the Falcons will have to disclose smoke damage to their residence solely on his reading of the Seller's Disclosure Statement:

> Q.     Are you aware of any – is there a commentary, a note, some
>        sort of technical journal in the broker industry that says that you
>        have to report smoke damage to a potential buyer of your
>        home?  Do you know of any such document that says that?
> A.     Other than the buyer's – the seller's disclosure statement that
>        they have to sign.

(Dkt. # 30-3 at 17:5–12.)  However, the only provision in the Seller's Disclosure

Statement that Fields can point to states that the seller must disclose "[a]ny

condition on the property which may materially – affects the physical health or

safety of the individual."  (Id. at 17:19–21.)  Fields indicated that he believed this

would require the disclosure of smoke damage because "he met with real estate

companies and [he] discussed with the agents the dangers and concerns of smoke

damage."  (Id. at 19:23–25.)  Additionally, Fields was unsure of whether a seller

would have to report smoke damage that had since been remediated.  (Id. at 19:14–

19.)  Fields has no experience selling property that has been exposed to wildfire

smoke.  (Id. at 143:18–21.)

        Fields' knowledge about a seller's disclosure obligation stems only

from brief discussions with real estate agents and his reading of the Seller's

Disclosure Statement.  Jury members are just as capable of reading the Seller's

Disclosure Statement themselves, and therefore, the Court finds Fields will not

provide any specialized experience, skill, or knowledge that can help the jury

interpret the relevant provision of the Seller's Disclosure Statement.  Therefore,

Fields' expert testimony on this subject is excluded.

> 2.      Opinions Regarding Any Diminution in Property Value due to Smoke Damage

> Fields' opinions regarding diminution in property value are based on

nothing more than his speculation and hearsay.

> Q.      Have you ever done any research into valuation or price as it
>         may be affected by smoke inundation in the wildfire context?
> A.      I have not done any research myself.

(Dkt. # 30-3 at 143:22–25.)  When pressed further, Fields stated, "[t]he only thing

I've done is talk to a group of realtors there that indicated how the fire had affected

the houses and housing market there."  (Id. at 144:3–5.)

> Q.      And just so the jury is clear.  You're in this business, burn
>         business.  There's  research—market research and data that you
>         can actually go to to see what impact potential exposure to wild
>         fire smoke may have on the valuation of a house; isn't that
>         true?
> A.      That is probably true.  I don't know if it's true, but I'm going to
>         guess it's just.
> Q.      Okay.  And you –
> A.      I'm not going to argue with you about it.
> Q.      And you haven't searched that out, have you?
> A.      No.
> Q.      Okay.  And I take it you're not—you're not offering yourself as
>         an expert on whatever monitary [sic] number the house has
>         been devalued by this claim that you've got to disclose that?
>         You're not here to testify about that, are you?
> A.      No.

(Dkt. # 30-3 at 144:8–24.)

The Falcons cannot point to any specialized education, training, or knowledge that would qualify Fields as an expert to testify on any diminution in value of the Falcon residence due to alleged smoke exposure or damage.  The Falcons argue that Fields' fifteen-years of experience as a real estate broker qualifies him to offer this testimony.  (Dkt. # 30 at 7.)  However, this argument is undermined by Fields' deposition, in which he admits that although he maintained his real estate license between 2008 and 2011, he did not sell a lot of real estate during that time period.  (Dkt. # 27-2 at 26.)  The burden is on the Falcons to demonstrate Fields' expertise in this area, and the Court finds that they have not done so.

The Court finds that Fields is not qualified to offer expert testimony on any of the above subjects.  Generally, this conclusion would alleviate the need to evaluate the reliability of Fields' sampling methods and samples; however, because the samples taken by Fields form the basis for the Falcons' other experts' opinions, particularly those offered by Marion Armstrong, the Court must address the reliability Fields' samples and sampling techniques.

C.    Reliability of Fields' Samples

As above, the burden to demonstrate reliability rests with the proponent of expert testimony.  Orthoflex, 2013 WL 6476371, at *1.  Under Daubert and Rule 702, the Court is tasked with "making a preliminary assessment

28

of whether the reasoning or methodology . . . is scientifically valid and of whether

that reasoning or methodology properly can be applied to the facts at issue."

Pipitone, 288 F.3d at 244 (internal citations and quotation marks omitted).  To

evaluate reliability, Daubert contains a non-exclusive list of factors a court may

look to, including (1) whether the proffered theory or method has been or can be

tested; (2) whether the theory or method has been subjected to peer review and

publication; (3) any known or potential rates of error; and (4) whether the theory or

method has gained general acceptance in the scientific community.  Id. (citing

Daubert, 509 U.S. at 593–94).  This inquiry is a flexible one and must be adapted

to suit the particular contours of each case.  Id.

         1.    Fields' Particulate Samples

        Fields sent in two sets of samples of particulate matter to Armstrong

Labs which resulted in laboratory reports dated December 29, 2011 and January

17, 2012.[5]  (Dkt. ## 29-5, 29-6.)

        Fields first took samples at the Falcon residence during the fall of

2011.  (Dkt. # 30-3 at 38:10–13.)  During this visit, he collected between twenty

and twenty-five samples of particulate matter.  (Id. at 38:14–17.)  These samples

were taken using Q-tip swabs, sterile swabs, alcohol swabs and slides.  (Id. at

---

[5] There is also a laboratory report from Armstrong Labs dated January 28, 2012; however, this report is identical to the January 17, 2012 report.

38:25–39:1.)  However, at his deposition, Fields did not know how many of each

type he took.  (Id. at 40:2–6.)

       Fields sent one sample to Armstrong Labs and stored the remaining

samples at his office in a climate-controlled bag.[6]  (Id. at 32:14–33:3.)  Fields

maintains that these bags are labeled with the date and location where the sample

was taken.  (Id. at 35:9–12.)  However, at his deposition, Fields could not state

from where he took samples because he had not brought the sample bags with him

and had no other record of the information.[7]  (Id. at 36:23–37:8; 88:20–25.)

       First, it appears that Fields did not collect samples in accordance with

any generally accepted protocol.  Fields claims his methods derived from

conversations with Everett and a single post hoc conversation with Armstrong.

(Dkt. # 30-6 at 1; Dkt. # 30-3 at 27:5–19.)  However, during his deposition, Fields

could not point to any established process that he used—there was no written

protocol, he provided no justification for the locations from which he took

samples, and he created no documentation that would allow another individual to

evaluate his process.  Fields could not even say for certain whether he had tested

---

[6] Fields clarified that he stored the samples in a Ziploc bag placed in a container in
an air-conditioned office.  (Dkt. # 30-3 at 92:23–93:10.)

[7] Fields states he did not bring copies of the bags because "[w]ell, because I own
them and I haven't been paid for them.  Everybody else gets paid, but I don't.  So,
you know, I didn't bring them."  (Dkt. # 30-3 at 35:17–19.)

any of the soft surfaces in the Falcon residence, stating "I do not remember, but I believe I did do soft surface testing at their house." (Dkt. # 30-3 at 95:20–23.) Although Fields could not name any industry-wide protocols for sampling, at the Daubert hearing, Defendants proffered the testimony of Michael Cleveland, a certified industrial hygienist, who testified that there are published standards for how one should sample for particulate matter or chemicals in the air. (Tr.1 at 51:3–52:3.) Cleveland also criticized Fields' failure to take a field blank to assess whether any of the particulate samples he took could have been contaminated. (Id. at 56:22–57:10.) Cleveland stated, in reference to both particulate and air samples, that when you fail to take a field blank, "[i]t destroys the reliability [of the sample] because you don't know whether the substances that were picked up on the sampling media came from what you sampled on the surface or what you may have—come from you and contaminating the sampling media just by handling the sampling media." (Id. at 58:9–13.) Emphasizing the importance of taking a field blank, Cleveland stated, "I've never taken—taken any sort of industrial hygiene sample, whether for the air, or for surface [particulate] where I did not prepare field blanks as part of the sampling." (Id. at 59:25–60:2.)

Second, the samples Fields sent off to Armstrong Labs do not appear to be representative. Rather than sending a variety of samples in an attempt to evaluate the actual condition of the Falcon residence, Fields sent samples which

31

appeared to show smoke contamination.  Fields chose which samples to send

visually, and stated, "[a]nd you know, if I would have one that has an odor that

smells like smoke, I would probably choose to send that one too.  It's usually not

by smell.  It's by sight."  (Dkt. # 30-3 at 92:10–13.)  Fields even stated that he

chose a sample with a darker stain on it because, he was "looking for issues of

smoke damage to the house and that is one of the indicators that [he had] found to

be consistent in [his] testing."  (Id. at 92:14–18.)  Additionally, when asked why

Fields only sent one sample to Armstrong Labs in January 2012, Fields stated,

"[i]t's hard for me to remember back to January 10th, 2012, but evidently that was

the sample that I felt would have smoke contaminants on it."  (Dkt. # 30-3 at

94:16–20.)  The inherent bias in Fields' method makes the samples unreliable.  See

U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO,

313 F. Supp. 2d 213, 233–34 (S.D.N.Y. 2004) (excluding expert testimony when it

relied on a biased sample of data that was skewed to reflect the desired

conclusion).  "The reliability of any analysis depends upon an unbiased selection

of the sample data."  Id. at 233.  Here, Fields has clearly failed to apply any

scientifically competent methodology to ensure that he provided a sample to

Armstrong Labs that was representative of the condition of the Falcon residence.

Instead, Fields sent only those samples which he believed confirmed his

conclusion.  (See id. at 92:10–13.)  Because the samples provided by Fields for analysis were biased, the Court finds that they are unreliable.

Fields also indicated that he only sent a few samples because he was not always receiving the payments he believed he was due.  (Dkt. # 30-3 at 91:14–25.)  Fields stated, "[k]nowing that I'm not going to get paid doesn't make me just send every damn one of them, or I would."  (Id. at 91:23–25.)  A sample size determined by Fields' financial motivations does not give this Court confidence in the reliability of Fields' methods.

Third, Fields failed to account for any other potential sources of smoke contamination, thereby providing Armstrong Labs with an incomplete picture from which to draw conclusions.  Fields did not inquire as to whether the Falcons smoked cigarettes (id. at 86:9–12); whether they had or used a fireplace (id. at 86:15–23); whether they had a barbeque pit (id. at 87:3–5); or whether they knew of any other source of smoke particulate (id. at 87:8–11).  Although Fields did not hold himself out as an expert on potential sources of contamination, because Armstrong Labs relied entirely on his samples to reach its conclusions without any other investigation, the Court finds that the failure to provide information regarding other possible sources of contamination makes any conclusion drawn from these samples faulty, at best.  See U.S. Info. Sys., Inc., 313

33

F. Supp. 2d at 238 ("An expert must demonstrate that he has adequately accounted for obvious alternative explanations in order for his testimony to be reliable.").

Fourth, there was a significant delay in the time between when Fields collected one of the samples and when he sent it to Armstrong Labs.  (Dkt. # 30-3 at 96:24–97:6.)  Fields only explanation for this delay was that it may have been because of the holidays.  (Id. at 97:1–6.)  Further, Fields could not provide any documentation of how the sample was stored during this delay.  (Id. at 97:9–14.)

> Q.     Well, do you have any kind of chain of custody slip in here that shows how [the sample] was dealt with by you in between the time you took it and the time you sent it to Armstrong?
> A.     Other than my good word saying I had custody of it, no.

(Id.)  Although this in itself may not invalidate the sample, it certainly indicates a lack of rigor in Fields' process of collection and transmission of the samples and weighs in favor of a finding of unreliability.

After careful consideration of Fields' particulate sampling methods, the Court finds that his methodology is unreliable.  His samples represent a skewed data set and are the product of unreliable techniques and handling procedures. Therefore, the Court excludes these samples and any expert testimony based upon them as unreliable.

2.    Fields' Air Quality Samples

In July of 2013, Fields returned to the Falcon residence and took a Sep-Pak sample of the air quality.  (Dkt. # 30-3 at 41:9–12.)  As discussed above, Fields training for how to take a Sep-Pak sample consisted of a few conversations with industrial hygienists and his own reading of the directions on the Sep-Pak. (Id. at 134:19–25, 135:15–19.)

When asked about the protocol for taking a Sep-Pak sample,[8] Fields testified that "[y]ou tear it open.  You take – there's a cap on the end of each of it and you attach that to your vacuum pump and you set it up on a tripod and elevate it and you turn [it] on and run it for one hour."  (Id. at 138:8–11.)  When asked whether and how he calibrated it, Fields stated that he had a calibration mechanism, and he calibrated the pump for one thousand CCMs per hour.  (Id. at 138:17–21.)  Fields continued, "[a]ll I do is set it on the one and for 60 minutes. That's how you calibrates [sic] the vacuum pump."  (Id. at 139:3–5.)  Even in his subsequent affidavit, all Fields could state regarding calibration was that the Sep-Pak was "calibrated before each use with an SKC-Rotameter."  (Dkt. # 30-6 at 2.) Fields did not take a blank sample, and during his deposition, he stated he was not familiar with the concept.  (Dkt. # 30-3 at 142:23–25.)  As discussed above,

---

[8] Fields was also unfamiliar with the protocol for storing a Sep-Pak, stating he did not know at what temperature a Sep-Pak had to be kept, just that it should be chilled.  (Dkt. # 30-3 at 136:21–137:5.)

Cleveland testified that field blanks are necessary "to make sure that you couldn't contaminate the samples by the way you have handled the sampling material." (Tr.1 at 53:19–23.)

Defendants presented Cleveland's testimony to establish that Fields did not properly calibrate the Sep-Pak filter, and therefore, the samples obtained from it were unreliable. Cleveland testified that Fields' method of calibration, using an SKC-Rotameter is considered to be a secondary method of calibration. (Id. 62:19–22.) He stated that the commonly accepted protocol when taking a Sep-Pak sample is to calibrate it to a primary standard for accuracy, like a bubble tube. (Id. at 61:2–11.) He testified that in order for an accurate sample to be taken with an SKC-Rotameter, it must first have, itself, been calibrated to a primary standard. (Id. at 64:10–16.) Cleveland stated that these calibration practices are commonly accepted in the industrial-hygienist community and could be found in "the White Book," published by the American Industrial Hygeine Association, which Cleveland refers to as "the bible in our business." (Id. at 51:10–20.) However, Cleveland could find no indication in Fields' affidavit or deposition that the SKC-Rotameter he had used had first been calibrated to a primary standard. (Id. at 64:17–23.)

The Court finds that based on the testimony and exhibits presented, the Falcons have failed to establish the reliability of the air quality samples taken

by Fields.  The testimony of Cleveland, a certified industrial hygienist with decades of experience in taking surface and air quality samples, relying on published industry standards, casts serious doubt on the accuracy of Fields' techniques.  Additionally, Fields' own testimony demonstrated his lack of understanding of the procedures and sampling methods he was using.  Although the Falcons' counsel insinuated that there was no concrete information that Fields had improperly calibrated the Sep-Pak (Tr.1 at 71:21–24), as the proponent of the testimony, it was the Falcons' burden to affirmatively demonstrate to the Court that the procedure used by Fields was reliable.  They have not done so.

After consideration of the testimony, arguments, and exhibits, the Court finds that Fields' apparent lack of knowledge of calibration procedures, his failure to demonstrate that he calibrated the Sep-Pak properly, and his failure to take any field blanks as controls, demonstrate that these samples are inherently unreliable and cannot be used to form the basis of any expert opinion.

In conclusion, the Court finds that both the particulate and air quality samples taken by Fields and sent to Armstrong Labs for analysis are unreliable. The Court excludes these samples as well as any expert testimony or opinion based upon them.

II.    <u>Plaintiffs' Expert:  Marion Armstrong</u>

State Farm challenges Armstrong's expert opinions on the following topics:  (1) damage to the Falcons' property and residence; (2) the necessity of remediating the Falcon residence; (3) whether the Falcons' health conditions are related to the alleged smoke damage in the Falcon residence; and (4) whether industrial standards for exposure to formaldehyde and acrolein can be used to establish  residential standards.  (Dkt. # 29 at 2.)

A.    <u>Armstrong's Qualifications</u>

As a preliminary matter, the Court finds that Armstrong is well qualified to offer expert testimony on matters related to industrial hygiene. Armstrong received a Bachelor of Arts degree from Austin College in 1985 with majors in Chemistry and Philosophy.  (Dkt. # 29-3 at 30.)  She obtained a Masters of Science in Public Health from the University of Utah Rocky Mountain Center for Occupational and Environmental Health with a specialty in Industrial Hygiene in 1987.  (<u>Id.</u>)  And finally, she received a Masters of Business Administration from Texas Christian University in 2006.  (<u>Id.</u>)  Additionally, Armstrong is a Certified Industrial Hygienist with the American Board of Industrial Hygiene (Certificate # 5657) and a Licensed Mold Assessment Consultant in the State of Texas (License # MAC0278).  (<u>Id.</u>)

Armstrong has been with the Armstrong Labs since 1996, where she has held positions as a Senior Consultant, President, and Vice President of Services.  (Id.)  Prior to that, she worked with various organizations in roles managing health and safety, as an industrial hygienist, and as a laboratory technician.  (Id.)  Additionally, she has developed numerous programs concerning topics related to industrial hygiene.  (Id.)  Armstrong has more than twenty years of experience developing and conducting training programs including courses related to indoor air quality assessment, sample collection, evidence handling, and respiratory protection certification.  (Id. at 31–32.)  She also has completed numerous continuing education programs related to industrial hygiene.  (Id. at 33–36.)

However, as well educated and qualified as Armstrong may be, the Court has already found that the samples provided to Armstrong were unreliable and not suitable to form the basis of an expert's opinion,[9] therefore, the Court will

---

[9] Although there may be some argument that as an expert, Armstrong is qualified to determine what are and are not reliable samples upon which to base her opinion, the Court finds that Armstrong's deposition testimony makes clear that she disclaims all responsibility for the scientific reliability of the samples she analyzed, and for this reason, the Court will not defer to her judgment regarding the reliability of those samples.  In her deposition, Armstrong testified:

Q.     Do you have the same level of confidence with samples you haven't taken?

exclude any of Armstrong's opinions that rely solely on the samples provided by Fields.

      B.    <u>Armstrong's Offered Opinions</u>

      Armstrong's opinions are contained in three expert reports dated August 14, 2013 ("August Report," Dkt. # 29-2), September 26, 2013 ("September Report," Dkt. # 29-3), and October 1, 2013 ("October Report," Dkt. # 29-4).

      1.    <u>The August Report</u>

      In the August Report, Armstrong offers her opinions critiquing the reports of two other laboratories, Ninyo & Moore and Exponent.  (Dkt. # 29-2 at 2.)  The Ninyo & Moore Report, dated May 3, 2012, was a report issued by Ninyo & Moore critiquing Armstrong Labs' analysis of Fields' samples and the conclusions Armstrong Labs drew from those samples.  (<u>Id.</u>)  The Exponent Report

---

      A.    I have confidence in the consultants who submit samples to us. I mean, I – I take it for granted that everybody does the job that they say they have done. . . .

(Dkt. # 29-1 at 25:19–24.)  Similarly, Armstrong explicitly states, "[v]arious information contained within [her expert report] may have been received from third parties and Armstrong assumes no responsibility for its accuracy."  (Dkt. # 29-2 at 12.)

Additionally, Armstrong Labs issued various disclaimers including that "Armstrong is not responsible for any Client errors resulting from improper or incorrect sampling procedures, atmospheric conditions at the time of sampling, from shipping conditions or methods."  (Dkt. # 29-7 at 2.)

was issued by Exponent, a forensic laboratory, that collected and analyzed its own samples from the Falcon residence.  (Id. at 10–11.)

> a.     Armstrong's Opinions Regarding Wildfire Smoke Generally

The August Report begins with a discussion of the general behavior of wildfire smoke particulates and the effect wildfire smoke can have on nearby residences.  (Dkt. # 29-2 at 2–4.)  Given her extensive experience in industrial hygiene, this is the type of opinion she is qualified to render.  Additionally, opinions regarding the typical behavior and general effect of wildfire smoke will be helpful to the jury.  Therefore, the Court finds that Armstrong's opinions on this topic are admissible.

> b.     Armstrong's Opinions Critiquing the Ninyo & Moore Report from May 3, 2012

Because the May 3, 2012 Ninyo & Moore Report was a critique of Armstrong Labs' analysis of the Fields samples, and the Court has already excluded the Fields samples, Armstrong's opinions regarding the Ninyo & Moore Report are irrelevant, and will not be admitted.[10]

---

[10] The Court notes that Armstrong has never visited the Falcon residence and her opinions regarding smoke contamination arise solely from samples sent by Fields and her analysis of the Exponent Report.  (Dkt. # 29-1 at 6:3–4.)

c.    <u>Armstrong's Opinions Regarding the Exponent Report</u>

The August Report also contains a critique by Armstrong of a report issued by Exponent Labs analyzing samples collected on October 4, 2012 from the Falcon residence (the "Exponent Report").  (Dkt. # 29-2 at 10–11.)  Armstrong criticizes the fact that Exponent's samples were taken "no more than 3–4 feet from the floor" and only two of the sample locations "appear to be areas that could reasonably represent the exterior wall cavities of the structure." (<u>Id.</u> at 11.)  The Court finds that Armstrong's education, training, and experience qualify her to offer these opinions and that these opinions are worthy of consideration by the jury.

2.    <u>The September Report</u>

To prepare the September Report, Armstrong expanded the scope of documents she analyzed and reviewed.  Along with offering her opinions regarding the May 3, 2012 Ninyo & Moore Report, the Exponent Report, and the behavior and effect of wildfire smoke generally, Armstrong also offered her analysis of four Armstrong Labs laboratory reports.  (Dkt. # 29-3 at 2.)  Armstrong additionally reviewed the Defendant's document production and the videotaped depositions of Tanya McLendon and Vidale Coleman.  (<u>Id.</u>)  To the extent that Armstrong's opinions are duplicative of the August Report, the Court will permit or exclude them as discussed above.

42

a.      The Armstrong Laboratory Reports

In the September Report, Armstrong offered her opinions regarding

four laboratory reports created by Armstrong Labs issued December 29, 2011,

January 17, 2012, June 28, 2012, and July 9, 2013.  (Id. at 2.)  Each of these lab

reports analyzed samples taken from the Falcon residence by Fields and sent to

Armstrong Labs.  (Id. at 5.)  Because the Court already has excluded these samples

as unreliable, any opinions Armstrong has regarding the corresponding lab reports

or conclusions she has drawn from these samples are unreliable and no longer

relevant, and the Court excludes them.  This includes opinions that the Falcon

residence was damaged by the Bastrop wildfire, that not all of the damage had

been remediated, that smoke particulates and chemicals remained in the residence,

and whether further remediation of the Falcon residence is necessary.

3.      The October Report

Armstrong issued a final report on October 1, 2013, after reviewing

Donna Falcon's deposition and speaking with her on the phone on September 30,

2013.  (Dkt. # 29-4 at 2.)  To the extent Armstrong's conclusions in this report are

duplicative of the August Report and September Report, they are permitted or

excluded as discussed above.

a.    Armstrong's Opinions regarding the General Hazards of
Exposure to Smoke Components

Armstrong begins her October report with a general discussion of the

symptoms that may result from exposure to smoke.  (Id. at 3.)  As the basis for her

opinions, Armstrong cites to standards from government agencies including the

Environmental Protection Agency, the National Institute for Occupational Safety

and Health, and the Occupational Safety and Health Administration.  (Id.)  As an

industrial hygienist, Armstrong is qualified to discuss the general problems that

may arise from exposure to wildfire smoke or its components.  During her

deposition, Armstrong stated:

> Q.    Is it fair to say, Ms. Armstrong, that you can tell us based on
> your training and education what the literature might say with
> regard to what a chemical might cause in terms of physical
> symptoms?  Is that fair?
> A.    That's fair, yes. . . .
> Q.    . . . [T]hat's the extent of what you can testify to with regard to
> – to health issues; is that fair?
> A.    Well, that's what an industrial hygienist does, yes, sir.

(Dkt. # 29-1 at 14:3–15.)

The Court finds her opinions regarding the general hazards of smoke

exposure admissible because they are based on both her experience and on

standards issued by government agencies.  The Court is finds that Armstrong's

opinions on this topic are reliable and worthy of consideration by the jury.

44

b.    Armstrong's Opinions Regarding Exposure Limits

Armstrong next discusses the permissible limits for exposure to smoke components.  (Dkt. # 29-4 at 4–6.)  Armstrong maintains that there are "no regulatory standards or industry guidelines for indoor air quality in a residential setting associated with smoke or the gaseous components of smoke."  (Id. at 4.) Armstrong asserts that there are published exposure limits for formaldehyde and acrolein in an occupational environment and opines that it is permissible to manipulate these numbers to develop exposure limits for indoor residential environments.  (Id.)  In her deposition, Armstrong states that she took the maximum level of exposure permitted in a workplace environment for an eight-hour day and used a multiplicative factor to obtain the maximum level of exposure that would be safe in a residential environment.  (Dkt. # 29-1 at 56.)  Based on these extrapolations and the Sep-Pak air quality sample provided by Fields, Armstrong concluded that the levels of acrolein and formaldehyde detected in the Falcon residence exceeded safe exposure limits.  (Dkt. # 29-4 at 6.)

Because these conclusions are based on the air quality sample provided by Fields that the Court has already excluded, Armstrong's conclusion that formaldehyde and acrolein are present in the residence in levels in excess of exposure limits are unreliable, and the Court excludes them.

45

Additionally, the Court finds that Armstrong's conclusions regarding exposure limits must be excluded because her methodology is scientifically unreliable.  State Farm contends, and this Court agrees, that Armstrong should not be permitted to render an opinion regarding safe exposure limits for formaldehyde and acrolein in a residential environment because her method of extrapolating residential exposure limits from workplace exposure limits is unproven and not generally accepted.  (Dkt. # 29 at 9.)

First, Armstrong has not shown that her methods are the result of any testing or experiment.  Neither has she provided any evidence establishing that her method of extrapolation is accurate.  State Farm contends that exposure standards usually are developed through "in-depth toxicological reviews and analysis of exposure scenarios that generally take months or years to develop."  (Dkt. # 29 at 10.)  In contrast, Armstrong has not provided any evidence that her method derived from any review, analysis, or accepted theory of exposure effects.

Second, there is no general acceptance of Armstrong's methodology in the scientific community.  Armstrong based her extrapolation calculations on nothing more than her own intuition, she can name no study or article supporting her calculations.  (Dkt. # 29-1 at 54:1–22.)  Armstrong claims that this is just what industrial hygienists do; however, she cannot point to a single piece of peer-

reviewed literature approving of her calculations or providing any basis for her methods.  (Id.)

Armstrong has not put forth any evidence supporting her assertion that this is an appropriate way to estimate residential exposure limits.  In fact, the American Industrial Hygiene Association has stated that occupational exposure limits "are not meant to apply to the general population and are not to be used as community-based standards.  Furthermore, the application of some set safety factor (e.g. divide the [occupational exposure limit] by 100) to produce a community-based standard from an [occupational exposure limit] is equally inappropriate." (Dkt. # 29-11 at 59.)  Additionally,  Stephen Waide, a certified industrial hygienist, testified he had never seen the occupational exposure limits manipulated the way Armstrong did, stating, "I have many times seen hygienists bring those out and – and show them what those numbers are as – for informational purposes, but I've never seen anybody try to extrapolate and get – get new numbers based on that." ("Tr.2," Dkt. # 63 at 205:16–19.)

Additionally, Armstrong failed to account for inherent differences between the scenario she is extrapolating from, a workplace environment, and the scenario she is extrapolating to, a residential environment.  State Farm asserts that workplace standards are often calculated based upon a theory of exposure for twenty-four hours per day, seven days per week, to a continual source of the

47

chemical.  (Id.)  That data is particularly inapplicable here because the Bastrop fire

was a discrete event, not a continuous source of formaldehyde and acrolein.  State

Farm maintains that the two relevant chemicals, formaldehyde and acrolein, have

very short half-lives (Dkt. # 29-11 at 26, 196); therefore, the exposure levels would

dramatically decrease when the precipitating event, the Bastrop wildfire, was no

longer occurring.  (Id.; Tr.2, at 230:14–231:2.)  Similarly, Armstrong does not

appear to take into account varying factors in concentrations of chemicals in

different locales.  (See Dkt. # 29-11 at 27 ("Rural or suburban air generally

contains lower concentrations of formaldehyde than urban air.  Indoor air often

contains higher levels of formaldehyde than outdoor air."); id. at 70 ("The levels of

formaldehyde in indoor air are often ten times higher (or more) than levels

outdoors . . . .").)  Armstrong's failure to account for these differences, or even

reference them, casts serious doubt on the reliability of her methods.

          Armstrong's methods do not "bear the necessary indicia of intellectual

rigor" that Daubert requires prior to admission.  See Black v. Food Lion, Inc., 171

F.3d 308, 312 (5th Cir. 1999).  "Without question the burden is on the proponent of

evidence to prove its admissibility.  Moreover, mere assurances by an expert

witness as to the accuracy of his own methods or results, in the absence of other

credible supporting evidence, is insufficient."  Castellow v. Chevron, USA, 97 F.

Supp. 2d 780, 792 (S.D. Tex. 2000).

48

Armstrong's methods for extrapolating indoor residential chemical exposure limits lack any scientific foundation and are unreliable. Armstrong's own assurances that her methods are reliable are not enough to permit the Court to allow her testimony. See id., 97 F. Supp. 2d at 792. Therefore, the Court excludes Armstrong's testimony regarding the ability to extrapolate from occupational exposure limits to accurate residential exposure limits.

        c.      Armstrong's Opinions Regarding the Cause of Donna Falcon's Alleged Health Conditions

Armstrong opines that Donna Falcon's symptoms are consistent with exposure to the components of wildfire smoke and indicates that Donna Falcon had not reported these symptoms prior to the Bastrop wildfire. (Dkt. # 29-4 at 6.) However, the Court notes that as of September 27, 2013, the date of Armstrong's deposition, Armstrong had not reviewed any of Donna Falcon's medical history or even spoken to the Falcons. (Id. at 6:1–2, 12:2–4.) Additionally, at her deposition, Armstrong testified that she did not believe that she would be offering any opinions regarding Donna Falcon's alleged health problems. (Dkt. # 29-4 at 12:21–25.) However, a mere four days later, Armstrong tendered her October report and concluded that Donna Falcon's symptoms are consistent with wildfire smoke exposure.

State Farm argues that Armstrong is not qualified to render an opinion on the relationship between the Donna Falcon's alleged health problems and any alleged smoke damage in the Falcon residence.  (Dkt. # 29 at 8.)  In assessing a Daubert challenge, "the court must make an objective, independent validation of the principles and methods used by the expert to insure that they have a sound and reliable basis in the knowledge and experience of the discipline at issue." Castellow, 97 F. Supp. 2d at 784.

First, the Court finds that it is well within Armstrong's expertise to discuss common symptoms resulting from exposure to smoke particulates. However, in this case, Armstrong's opinions that Donna Falcon's symptoms are consistent with exposure to smoke particulate appears to be based on the results of Armstrong Lab's analysis of the Fields samples.  Because the Court has excluded the Fields samples, they cannot form the basis for her opinion, and her testimony on this subject must be excluded.

Second, although as an industrial hygienist, Armstrong likely is familiar with the symptoms that can result from exposure to smoke, she is not a medical doctor, and the Falcons have not provided any evidence that Armstrong is qualified to testify that the Bastrop fire was the cause of Donna Falcon's symptoms.  See e.g., King v. Synthes (U.S.A.), 532 F. Supp. 2d 828, 832 (S.D.

50

Miss. 2006) (finding that a proffered expert who lacked a medical degree was not qualified to render an opinion regarding causation of a medical injury).

    Third, Armstrong's method for reaching her conclusion as to causation is unreliable.  Armstrong reached her conclusion that Donna Falcon's symptoms were consistent with wildfire smoke exposure without knowledge of whether there were any other possible causes and without even reviewing Donna Falcon's medical history.  (Dkt. # 29-1 at 12:2–7.)  For example, Armstrong does not address the fact that at least one of the Falcons smoked (Dkt. # 30-3 at 86:9–12), that Donna Falcon may have been exposed to smoke particulates from a fire place or barbeque pit (Dkt. # 30-3 at 87:1–7), or that the chemicals may have come from internal furnishings within the house.  It is a general scientific principle that correlation does not imply causation; however, Armstrong has taken nothing more than a correlation and concluded that "Ms. Falcon's signs/symptoms that have been experienced since the 2011 wildfire event and continue whenever occupying the Subject Property are the same as the health effects of the noted smoke components identified to be present in the Subject Property."  (Dkt. # 29-4 at 6.) In forming this opinion, Armstrong did not review Donna Falcon's medical files or conduct any in-depth review of her health condition.  "Before a conclusion on causation can be reliably drawn, the expert must make some reasonable attempt to eliminate some of the most obvious causes."  U.S. Info. Sys., Inc., 313 F. Supp. 2d

at 238.  Armstrong has not done this; her conclusions are, at best, based upon a

severely incomplete assessment of the Falcons' environment, and are therefore,

unreliable.

Therefore, the Court excludes Armstrong from testifying that the

symptoms Donna Falcon complained of are due to exposure to wildfire smoke

components remaining in the Falcon residence.  Armstrong provides no expertise

on this subject; all she can do is repeat what Donna Falcon told her.  Therefore,

because Donna Falcon is capable of relating that information herself to the jury,

Armstrong's testimony on this subject is excluded.

In conclusion, the Court finds Armstrong qualified to testify, in

general, to the symptoms commonly caused from exposure to residual chemicals

and particles from smoke; however, Armstrong has not established that she is

qualified to testify to the cause of Donna Falcon's particular symptoms.  Any of

Armstrong's opinions that the Falcon residence posed a health hazard or was the

cause of Donna Falcon's symptoms are excluded.

III.    Plaintiffs' Expert:  Stephen Hadhazi

State Farm has moved to strike the testimony of Stephen Hadhazi to

the extent that he opines (1) whether and to what extent the Falcon residence

suffered smoke damage as a result of the Bastrop wildfire and (2) whether State

52

Farm's agents acted in bad faith, made material misrepresentations to the Falcons, or acted unconscionably in their handling of the Falcons' claim.  (Dkt. # 28 at 2.)

Hadhazi's curriculum vitae states that he is a Licensed Public Insurance Adjuster in both Florida (Lic. # E150691) and Texas (Lic. # 1388578). (Dkt. # 36, Ex. C at 2.)  Additionally, he states that he has consulting experience in indoor air quality testing for mold and asbestos and that he has served as an appraiser on more than 200 cases and an umpire in more than thirty cases.  (Id.) However, Hadhazi does not list for whom he worked or whether he operated as an independent contractor during this time, and it is unclear whether the 200 cases he refers to are legal cases or simply instances where he has been employed as an appraiser.  (Id.)  Hadhazi has also had training in insurance adjusting.  (Id.)  He states that he received training from the Vale School of Adjusting in 1998, from Leonard's School of Adjusting in 1997, and that he worked as a property claims adjuster for Allstate Insurance (Pilot) between 2004 and 2005.  (Id.)

Hadhazi states that he has also received air quality training.  (Id.)  He maintains that he is a Certified Indoor Environmentalist (as per the Indoor Air Quality Association) 2000–2002; a Certified Mold Remediator (as per the Indoor Air Quality Association) 2000–2002; and a Certified Mold Remediation Supervisor (as per the Indoor Air Quality Association) 2000–2002.  (Id.)

Finally, Hadhazi states that he attended Remediation Technician Training in 2000, and he also attended Mold and Sewage Remediation Technician Training.[11] (Id.) Hadhazi does not state through what institution or organization he took these classes, whether there was any certification possible from them, or whether he completed these classes. (Id.)

A.   Testimony Regarding Smoke Damage to the Falcon Residence due to the Bastrop Wildfire

State Farm first contends that Hadhazi is not qualified to render an expert opinion on any smoke damage resulting from the Bastrop wildfire. (Dkt. # 28 at 2.) State Farm argues that Hadhazi has never estimated a wildfire case as a public adjuster, and his only experience comes from damage estimates he created for the Falcons' attorney in fifty to one hundred other cases. (Id.)

State Farm also challenges the reliability of Hadhazi's methods. (Dkt. # 28 at 3–4.) State Farm argues that Hadhazi's investigation of the smoke damage was inadequate and unreliable because he did not document what anyone told him when he visited the Falcon residence, did not take any field notes, did not take any photos or make any notes of alleged dirty or smoke damaged areas, and cannot recall any specific place where he found smoke damage, soot damage, or char, except on the roof. (Id. at 4.) State Farm argues that his assessment is grounded

---

[11] Hadhazi does not list when he attended Mold and Sewage Remediation Technician Training.

solely in a conversation with Donna Falcon where she stated she smelled smoke and that she did not believe Service Master cleaned the house properly.  (<u>Id.</u>) Further, State Farm asserts that Hadhazi failed to consult or use the Institute of Inspection Cleaning and Restoration Certification standards and did not consult any other standards or peer-reviewed articles to assist in evaluation of damage to the Falcon residence.  (<u>Id.</u> at 4–5.)  State Farm criticizes Hadhazi for failing to differentiate between smoke damage that may have come from the Bastrop fire and smoke damage from other potential sources.  (<u>Id.</u> at 5.)  Additionally, State Farm faults Hadhazi's estimate of the cost to clean personal property or the exterior of the residence because Hadhazi did not conduct any testing of any items, consult any guide or other source, or take any measurements or notes.  (<u>Id.</u> at 6.)  State Farm claims that Hadhazi simply "manufactured the number of $12,311.47 to clean non-porous items."  (<u>Id.</u>)

Hadhazi stated that he came up with this number using "just personal experience."  (Dkt. # 28-2 at 21.)  Hadhazi's deposition reveals

Q.     You just eye-balled it and came up with this $12,311.47 number?
A.     I did go room by room, and I came up with totals for each room in the home, I added them up, and that's what it came to.
Q.     Totals of what?
A.     Of how long I thought it was going to take to clean the non-porous items in those specific rooms.

55

(Id. at 22:4–8.)

State Farm also challenges Hadhazi's conclusion with respect the roof of the Falcon residence.  (Id. at 7.)  State Farm argues that Hadhazi's opinion that the roof should be replaced is unreliable because Hadhazi knew nothing about the roof other than that it was metal.  (Id.)  State Farm argues Hadhazi did not contact a metal roof manufacturer, research metal roofs, or test any of the allegedly smoke impacted grommets to determine if they were deteriorated.  (Id.)  State Farm contends that Hadhazi's reliance on his experience alone is misplaced here and makes his testimony unreliable.  (Id. at 8.)

In contrast, the Falcons argue that Hadhazi's experience qualifies him to opine on the type, extent, and cost of remediation to bring the Falcon residence to its condition prior to the Bastrop fire.  (Dkt. # 36 at 3.)  The Falcons point to Hadhazi's work experience with Harris County Construction, where his work focused on residential insurance claims and roofing replacement and repair, and his experience with Allstate Insurance Company where he handled numerous residential property claims as a claims adjuster.  (Id. at 4.)

Although Hadhazi may not have specific experience with wildfires, he states that he educated himself regarding the effects of smoke, soot, char, and ash when he previously worked on five wildfire cases in which he completed damage assessments.  (Dkt. # 28-2 at 67–68.)

56

The Court finds that Hadhazi's methods for reaching his damage estimate are unreliable, and his testimony will therefore be excluded.  Hadhazi can point to no actual method he used, other than "eyeballing" what he perceived to be damaged in the home.  Hadhazi provided no documentation of his methods and therefore precluded any assessment of the accuracy of his conclusions.  When asked whether his estimate could be assessed for validity, Hadhazi's only response was, "Well, I guess, you could perform the work and see if – if you're able to do it for that."  (Id. at 21:3–4.)  This statement does not convince the Court of the reliability of Hadhazi's methods.  Additionally, Hadhazi made no attempt to meet with State Farm or Service Master to discuss the differences in their damage estimates.  (Id. at 14:23–15:6.)

Similarly, Hadhazi performed no quantifiable test to serve as the basis for his damage estimate or to support his conclusion that the roof needed to be replaced.  In his report, Hadhazi states that the roof's washers were disintegrating and the foam plugging at the baffles had degraded, and there was discoloration consistent with oxidation.  (Dkt. # 36-1 at 19.)  In his very next sentence, he stated, "[t]he roof had obviously been covered with very hot ash and had been fire/heat/smoke damaged and was a covered loss under this policy."  (Id.)  This naked conclusory statement is the antithesis of proper scientific investigation.

Hadhazi provides no other basis for his assessment of the extent of damage to the roof.  (Id.)

Additionally, Hadhazi's conclusion that the alleged damage to the Falcon home was due to the Bastrop wildfire is unsound.  (Dkt. # 36-2 at 11:6–9.) Hadhazi bases this opinion on nothing more than the proximity of the Falcon residence to the wildfire.  In reaching his conclusion, Hadhazi made no attempt to account for any other possible source of smoke contamination; he summed up his causation analysis stating, "[w]ell, it was a fire and fire burned a lot of trees as well as homes, and the home of the Falcons was in the area of the fire, and it was inundated by smoke and heat; high winds; and their home was damaged."  (Dkt. # 36-2 at 14:12–15.)  His only other basis for concluding the Falcon residence had been damaged by the Bastrop wildfire was Donna Falcon's statement that the house did not smell of smoke before the wildfire.  (Id. at 16:20–24.)

Because of the lack of scientific process employed here, the Court excludes Hadhazi's testimony regarding the extent of damage to the Falcon residence.  His opinions as to the cause of the alleged damage are unreliable and lack a sound scientific foundation.

B.      Hadhazi's Opinions Based Upon Fields' Samples

Some of Hadhazi's opinions are based upon the results of the analysis of Fields' samples.  As discussed above, because the Court has excluded these

samples as unreliable, any expert opinion based upon these samples will similarly be excluded.

    C.    <u>Testimony Regarding State Farm Agents' Conduct</u>

State Farm argues that Hadhazi's testimony regarding State Farm's or its agents' bad faith and insurance code violations should be excluded.  (Dkt. # 28 at 8.)  State Farm argues that Hadhazi's opinion that State Farm acted in bad faith is based on nothing more than the fact that Hadhazi's estimate differed from State Farm's.  (<u>Id.</u>)  State Farm asserts that because Hadhazi did not review any of the State Farm claims file, the Service Master estimate for remediation, the depositions of State Farm's agents, or the Falcons' depositions, his opinion on whether State Farm acted with bad faith is unfounded and unreliable.  (<u>Id.</u> at 9.)  State Farm points out that Hadhazi cannot name who made misrepresentations to the Falcons and cannot properly define what constitutes good or bad faith.  (<u>Id.</u> at 9–10.)

In response, the Falcons argue that Hadhazi's licensing as a public adjuster is sufficient to qualify him to assess the "physical loss of or damage to structural or personal property, and structural or personal property values."  (Dkt. # 36 at 6.)

The Court agrees that Hadhazi's licensing qualifies him in areas of public adjusting.  However, Hadhazi was not engaged as a public adjuster in this case, rather he states in his report that he "was engaged to provide independent

consultation and evaluation of the damage, the coverage and of State Farm and its adjusters' claim handling in relation to this case."  (Dkt. # 36, Ex. 1 at 18.)

The Court finds that Hadhazi's experience is not enough to render his testimony reliable when all of his opinions are based on guesswork.  Hadhazi's report is filled with conclusory statements for which he provides no support, including the statement, "insurers frequently provide adjusters with cost data that is inappropriate for the loss being adjusted at the time repairs are sought, and expect their adjusters to estimate a scope of work that constitutes a partial remediation in the hope that it will satisfy a policyholder rather than scope a full remediation." (Dkt. # 36-1 at 17.)  Hadhazi also states, "I do not agree that serial partial remediation is reasonable because it virtually guarantees the policyholder cannot be paid the remediation costs properly, in full, and within the timelines provided by the Texas Insurance Code."  (Id.)  Statements like the latter make the Court very skeptical of Hadhazi's conclusions; Hadhazi essentially advocates that insurance companies should <u>always</u> immediately replace a damaged item, without attempting to clean it first.  From a common sense perspective, this is absurd.

Additionally, the Court finds that Hadhazi's testimony regarding State Farm's alleged bad-faith practices should be excluded.  First, Hadhazi's deposition testimony reveals that he is not qualified to opine on this topic.  (See Dkt. # 36-2.) His failure to be able to coherently define good or bad faith is troubling; the Court

60

also finds that although Hadhazi's report lists some "classic examples of bad faith," his deposition testimony makes clear that Hadhazi does not have any expertise in what constitutes good or bad faith.  (Dkt. # 36-1 at 5.)  When asked to define good faith Hadhazi states:

> Well, I mean, I think it's just to act – act appropriately towards an insured, you know, to kind of do unto them, as you'd want them to do unto you, as it were.  I mean, just to – just to treat them honestly and fairly and to – you know, just to deal fairly with the insured after a loss.

(Dkt. # 28-2 at 46:1–6.)  When asked to define bad faith, Hadhazi replied, he could "look it up if you like."  (Id. at 46:13.)  Part of the requirement for expert testimony is that it be helpful to the jury.  See Fed. R. Evid. 702.  Here, if all Hadhazi can contribute regarding bad faith is reading the definition from the Texas Insurance Code, his opinion is irrelevant and not helpful.  A jury is just as competent to read a statutory definition as Hadhazi is.

Moreover, Hadhazi's method of determining that State Farm engaged in bad-faith practices is unreliable.  Whether State Farm acted in bad faith depends in part upon the facts available to State Farm when it acted.  Higginbotham v. State Farm Mut. Auto. Ins. Co., 103 F.3d 456, 460 (5th Cir. 1997) (holding that an insurer has not acted in bad faith "if there was any reasonable basis for denial of that coverage.").  Hadhazi never spoke with anyone at State Farm regarding the Falcon case (Dkt. # 28-2 at 15:2–4); never reviewed State Farm's claim file for the

Falcons (id. at 6:16–19); never reviewed any of the depositions taken in the case (id. at 6:20–7:3); and never reviewed the Service Master cleaning estimate (id. at 7:4–13).  Without examining these items, Hadhazi can have no basis for understanding the facts available to State Farm when it acted on the Falcons' claims.  And the Court therefore excludes his testimony regarding whether State Farm acted in bad faith.

IV.    Defendant's Expert:  Stephen Waide

The Falcons contend that Stephen Waide is not qualified to render an expert opinion on the sampling methods employed by Fields and the testing and analysis performed by Armstrong Labs.  (Dkt. # 43 at 2.)  The Falcons argue that Waide lacks experience with smoke particulates and proper sampling and analysis techniques.  (Id. at 2–3.)  In support of these contentions, the Falcons point to the fact that Waide's experience is focused in mold and water damage; the Falcons claim that Waide's discussion regarding the shape of soot particulate is incorrect, and the Falcons argue that Waide misunderstands the sampling method used by Armstrong Labs.  (Id. at 3–5.)

In response, State Farm first asserts that the Falcons' objections to Waide's expert testimony are untimely, and therefore their motion must be denied.  (Dkt. # 44 at 1.)  State Farm submits the Court's scheduling order that states that

State Farm had to serve its expert designations by November 1, 2013.  (Dkt. # 18

¶ 3.)  The scheduling order provides that

> An objection to the reliability of an expert's proposed testimony under
> Federal Rule of Evidence 702 shall be made by motion, specifically
> stating the basis for the objection and identifying the objectionable
> testimony, not later than 14 days of receipt of the written report of the
> expert's proposed testimony or not later than 14 days of the expert's
> deposition, if a deposition is taken, whichever is later.  **The failure to
> strictly comply with this paragraph will be deemed a waiver of
> any objection that could have been made pursuant to Federal
> Rule of Evidence 702.**

(Id. ¶ 6.)  State Farm asserts it gave the Falcons notice that Waide would be

testifying as an expert on numerous occasions; however, the Falcons never sought

to depose Waide.  (Dkt. # 44 at 2.)  Because the Falcons never deposed Waide,

State Farm contends that their deadline to object to his testimony was fourteen

days after the Falcons were served with his written report and affidavit.  (Id.)

State Farm retained Waide as an expert during its underlying

investigation of the Falcons' claims.  (Id.)  Waide's report is dated May 3, 2012,

and he later submitted an affidavit dated October 9, 2013.  (Id.)

State Farm listed Waide on its initial disclosures to the Falcons, dated

September 20, 2012, and included a copy of his report at that time.  (Id. at 3.)  State

Farm supplemented its disclosures on January 1, 2013, and again listed Waide as

an expert witness.  (Id.)  On October 11, 2013, State Farm filed a motion to strike

the testimony of Marion Armstrong based upon Waide's opinions of Armstrong's

analysis.  (Id.)  At this time, State Farm also provided a copy of Waide's affidavit.  (Id. at 4.)

The Falcons did not move to strike Waide's expert testimony until November 21, 2013.  (Dkt. # 43.)  Even assuming the Falcons did not "receive the written report" until they received a copy of Waide's affidavit on October 11, 2013, their motion is still untimely.

Federal Rule of Civil Procedure 16(b) authorizes courts to control the progress of a case through a scheduling order and to enforce the deadlines of the scheduling order to preserve its "integrity and purpose."  Hodges v. United States, 597 F.2d 1014, 1018 (5th Cir. 1979).  This rule gives courts broad discretion including authorizing the exclusion of evidence as a sanction for a party's failure to comply with a scheduling order.  See Davis v. Duplantis, 448 F.2d 918, 921 (5th Cir. 1971); Fed. R. Civ. P. 16(f).  Here, the Court finds that the Falcons' failure to comply with this case's scheduling order, and failure to offer any explanation for their actions, warrants denial of their motion to strike.  (Dkt. # 43.)

However, the denial of the Falcons' motion to strike does not relieve this Court from its duty to act as a gatekeeper, and therefore, the Court shall address the Falcons' substantive objections regarding Waide's expert testimony.

A.    <u>Waide's Qualifications</u>

Stephen Waide obtained Bachelor of Science degrees from California

State University in School and Community Health in 1987 and in Occupational

Health and Safety in 1989.  (Dkt. # 43-1 at 7.)  Waide also holds a certification

from the American Board of Industrial Hygiene in Comprehensive Practice (CIH

# CP7005); a certification from the Board of Certified Safety Professionals in

Comprehensive Practice (CSP # 15352); a certification from the American Indoor

Air Quality Council as a Certified Indoor Environmental Consultant (CIEC

# 0611042); and he is certified as a Microbial Consultant (CMC # 0608087) by the

American Indoor Air Quality Council.  (<u>Id.</u>)

Waide lists extensive professional experience in industrial hygiene;

however, nearly all of his project experience listed on his curriculum vitae pertains

to mold and water damage.  (<u>Id.</u>)  While this is not directly on point for the present

case, Waide does hold general certifications in industrial hygiene.  Additionally,

Waide relies on operating procedures from various environmental consulting

laboratories across the country to support his conclusions.  (<u>Id.</u> at 10.)  During the

hearing, Waide indicated he has experience analyzing laboratory reports pertaining

to smoke contamination.  (Tr.2 at 184:6–185:1.)  The fact that Waide has more

experience analyzing mold does not disqualify him from testifying as an expert on

smoke particulates and chemical contaminants.  See United States v. Wen Chyu Liu, 716 F.3d 159, 168 (5th Cir. 2013).

An expert may be qualified based on knowledge, skill experience, training or education.  Fed. R. Civ. P. 702.  Here, Waide's general background in industrial hygiene and his use of reliable materials to educate himself on the particulars of smoke particulate analysis is sufficient to qualify Waide as an expert.

B.    Offered Opinions

The Falcons make much of Waide's characterization of the shape of smoke particulate particles.  They argue that Waide's characterization of them as irregularly shaped is incorrect.  However, this is something that can be challenged through cross-examination and will go to the weight of Waide's testimony rather than its admissibility.

Additionally, the Falcons challenge Waide's testimony criticizing the sampling procedures used by Fields and the analysis by Armstrong.  (Dkt. # 43 at 4–5.)  However, as these samples have already been excluded, any opinions or conclusions regarding these samples are now irrelevant, notwithstanding Waide's qualifications.

In conclusion, to the extent that Waide seeks to opine on matters independent from the Fields samples, including Armstrong's opinions that have not

66

been excluded by the Court and the nature and behavior of wildfire smoke, the Court finds Waide qualified.

CONCLUSION

For the reasons given above, the Court finds (1) Fields' expert testimony will be excluded and the samples he took, both those related to smoke particulates and those related to air quality, are excluded; (2) to the extent that Armstrong's opinions rely on the Fields samples, they are excluded; (3) Armstrong's opinions based upon her extrapolation of workplace standards to residential standards are excluded; (4) Armstrong's opinions as to the cause of Donna Falcon's health conditions are excluded; (5) Armstrong's opinions regarding the general behavior of wildfire smoke are admissible; (6) Armstrong's critiques of the Exponent Report are admissible; (7) Hadhazi's testimony and opinions regarding smoke damage to the Falcon residence are excluded; (8) Hadhazi's opinions related to whether State Farm or its agents acted in bad faith are excluded; and (9) Stephen Waide's testimony is admissible to the extent it does not rely on Fields' samples.

The Court (1) **GRANTS** Defendant's Motion to Exclude Fields' Testimony (Dkt. # 27); (2) **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Exclude Armstrong's Testimony (Dkt. # 29); (3) **GRANTS**

Defendant's Motion to Exclude Hadhazi's Testimony (Dkt. # 28); and

(4) **DENIES** Plaintiffs' Motion to Exclude the Waide'sTestimony (Dkt. # 43).

IT IS SO ORDERED.

Dated:  Austin, Texas, June 16, 2014.

David Alan Ezra
Senior United States Distict Judge

68